IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:23CR00101 BSM |
| | ) | |
| CANDACE CHAPMAN SCOTT | ) | |

### SENTENCING MEMORANDUM

The United States of America, by and through Jonathan D. Ross, United States Attorney for the Eastern District of Arkansas, and Amanda Jegley, Assistant United States Attorney, submits its Sentencing Memorandum requesting that the Court grant its motion for an upward variance and states in support:

### BACKGROUND

On April 25, 2023, the defendant was charged in a 12-count Indictment (ECF No. 3) with one count of Conspiracy to Commit Mail Fraud, four counts of Mail Fraud, one count of Conspiracy to Commit Wire Fraud, four counts of Wire Fraud, one count of Conspiracy to Commit Interstate Transportation of Stolen Property, and one count of Interstate Transportation of Stolen Property. On April 25, 2024, pursuant to a plea agreement with the United States, the defendant pled guilty to one count of conspiracy to commit mail fraud (Count 1) and one count of interstate transportation of stolen property (Count 12). The remaining charges were dismissed upon motion of the United States. (Doc. No. 48). Sentencing is currently set for January 16, 2025.

Pursuant to the plea agreement, the parties agreed to the following: that the base offense level is 7 under U.S.S.G. § 2B1.1(a)(1); that the offense level shall be increased by at least 2 levels because the loss exceeded $6,500; the defendant knew or should have known that a victim of the

1

offense was a vulnerable victim, and that the offense level shall be increased by 2 levels under U.S.S.G. § 3A1.1(b)(1); that the offense level shall be increased by 2 levels pursuant to U.S.S.G. § 3A1.1(b)(2) because the offense involved a large number of vulnerable victims; and that the offense level shall be increased by 2 levels because the defendant abused a position of trust pursuant to U.S.S.G. § 3B1.3. The United States does not intend to introduce any additional evidence at sentencing pertaining to the loss amount under U.S.S.G. § 2B1.1(a)(1); therefore, it does not anticipate more than the 2-level enhancement contemplated by the plea agreement. Accordingly, none of the enhancements are disputed, and the only items left to resolve at sentencing are restitution and the defendant's sentence.

According to the Pre-sentence Investigation Report (PSR), the defendant's total offense level is 12 (with the third level reduction for acceptance of responsibility), and her criminal history category is I. As it stands, the defendant's advisory Sentencing Guidelines range is 10 months' imprisonment to 16 months' imprisonment. The maximum statutory penalties for conspiracy to commit mail fraud and interstate transportation of stolen property are, respectively, 240 months' imprisonment and 120 months' imprisonment. Neither party is prevented by the plea agreement from seeking a variance or departure at sentencing. Because of the shocking and outrageous conduct of the defendant, the United States moves for an upward variance and requests that the Court sentence her to a term of 180 months' imprisonment.

## THE LAW

In *United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir. 2010), the Eighth Circuit Court of Appeals reiterated that district courts should follow a three-step process in determining an appropriate sentence: (1) the district court should first calculate the advisory Guidelines range; (2)

the district court should then consider whether any "departure" is warranted under the Guidelines; and (3) finally, the district court should determine whether the sentencing factors of 18 U.S.C. § 3553(a) justify a "variance" from the Guidelines sentence. *See also United States v. Ziegler*, 463 F.3d 814, 817 (8th Cir. 2006); *United States v. Maurstad*, 454 F.3d 787, 789 (8th Cir. 2006); *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005).

18 U.S.C. § 3553(a) provides in pertinent part:

The court, in determining the particular sentence to be imposed, shall consider-

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the Sentencing Guidelines];

. . .

(6) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct[.]

In addition to the factors enumerated in 18 U.S.C. § 3553, "[f]actors that have already been taken into account in calculating the advisory Guidelines range can nevertheless form the basis of a variance." *United States v. Stoner*, 795 F.3d 883, 885 (8th Cir. 2015) (quoting *United States v. David*, 682 F.3d 1074, 1077 (8th Cir. 2012)). The court may also consider the extent and likely duration of emotional or psychological injuries to the defendant's victims as a basis for an upward variance. *See United States v. Roberts*, 747 F.3d 990, 991 (8th Cir. 2014); *see also United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015) (implicitly recognizing "protecting the victims," as well as protecting the public, as a legitimate ground for an upward variance). It is also permissible to consider "the sentencing objectives of punishment and deterrence." *United States v. Braggs*, 511 F.3d 808, 811, 813 (8th Cir. 2008).

In considering the 18 U.S.C. § 3553(a) factors, the United States requests that this Court vary upwards and sentence the defendant to 180 months' imprisonment. "A sentencing court has wide latitude to weigh the section 3553(a) factors in each case and assign some factors greater weight than others in determining the appropriate sentence." *United States v. Richart*, 662 F.3d 1037, 1053-54 (8th Cir. 2011) (citations omitted) (finding that district court's upward variance from the guidelines range of zero to six months to consecutive 60-month sentences, for a total of 120 months' imprisonment, was not abuse of discretion because the circumstances of the offense were particularly egregious and out of the ordinary). *See also United States v. Anderson*, 664 F.3d 758, 766 (8th Cir. 2012) (finding that "[t]he district court properly considered the § 3553(a) factors and varied upward from the Guidelines range due to the egregiousness of Anderson's conduct, the potential for unwarranted sentencing disparities, and the desire to protect the public from further

4

crimes of Anderson.").

An upward variance to 180 months' imprisonment is justified in this case due to the shocking and outrageous nature of the offense, the callous disregard of the victims by the defendant, the need to reflect the seriousness of the offense, and the need to afford adequate deterrence to this particular type of criminal conduct. In support of the motion for upward variance, the United States has filed under seal the extraction of the Facebook messages exchanged between the defendant and Jeremy Pauley as Government's Exhibits A and B.[1]

## THE FACTS

The facts of this case are extraordinary and shocking in a way that is neither contemplated by the law nor the Guidelines. The basic facts are that the defendant, an apprentice mortician at a cremation business, repeatedly stole human remains and trafficked them for profit to Jeremy Pauley. She did so with full knowledge that Pauley intended to "plastinate" or otherwise preserve them for display, or, in the case of pieces of skin, "tan" them to bind books. *See Government's Exhibits A and B.* Among the remains the defendant trafficked were organs, skin, and other remains of medical cadavers who had been donated to an esteemed medical school for the noble purpose of medical research. This on its own is shocking, but what makes her conduct outrageous is that she trafficked two stillborn babies whose bodies were intended to be cremated, causing at least one of the mothers, whose baby was named Lux, to receive an urn of ashes falsely represented as her baby's ashes.

---

[1] The exhibits are redacted on the public docket to protect the privacy interests of the victims and third parties and to comply with requirements regarding personal identifiable information. The United States intends to submit unredacted exhibits to the Court for consideration at sentencing, and the United States respectfully requests that the unredacted version be filed under seal at the hearing.

The United States is only aware of two federal cases involving the fraudulent trafficking of stolen body parts. In *United States v. Hess, et al.*, No. 1:20CR98-CMA (Dist. of CO), defendants Megan Hess and Shirley Koch each pleaded guilty to wire fraud and aiding and abetting for their role in a scheme to illegally sell body parts or entire bodies for body broker services, when the victims did not consent to the sales or thought their family member had been cremated. Hess and Koch also delivered cremated remains to families with the representation that the cremated remains were that of the deceased when, frequently, that was not the case. https://www.justice.gov/usao-co/pr/sunset-mesa-funeral-home-operators-sentenced-federal-prison-illegal-body-part-scheme. Hess was sentenced to 240 months' imprisonment and Koch was sentenced to 180 months' imprisonment. However, both defendants are currently awaiting resentencing after the Tenth Circuit Court of Appeals found that the district court erred in calculating the loss amount and in its findings concerning several enhancements. *United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024).

In *United States v. Rathburn, et al.*, the main defendant, Arthur Rathburn, was convicted at trial of seven counts of wire fraud and transportation of hazardous materials for defrauding buyers of cadavers donated for science, and then dismembering and renting those cadavers for medical and dental training. Rathburn was eventually sentenced to 108 months' imprisonment on the wire fraud charges and to a concurrent term of 60 months' imprisonment for transportation of hazardous materials. https://www.oig.dot.gov/library-item/36555.

The defendants in both *Hess* and *Rathburn* were involved in schemes to sell body parts to body brokers for purposes of medical research or were selling infected or diseased parts for the same purpose. In this case, however, the defendant was selling stolen human remains knowing

6

they would be sent to Pauley, and then either kept in a collection, sold, or displayed at an "oddities" event. Like the defendants in the *Hess* case, the defendant here chose to steal and sell the human remains for a purpose not contemplated by the victims. Not one person who donated their body for medical use - and certainly not the mothers of Lux or the other stillborn infant - consented to the theft, diversion, and sale of the bodies for profit to Pauley. Most egregiously, like the defendants in *Hess* who delivered cremated remains when they did not belong to the deceased family member, the defendant here knowingly and fraudulently caused other ashes to be sent to Lux's grieving mother. PSR ¶ 10.

In a companion case, *United States v. Matthew Lampi,* Case No. 4:23CR00162-MWB (MDPA), the defendant was recently sentenced to fifteen months' imprisonment. That case is distinguishable from the facts here in that Lampi, a Minnesota resident, with whom Pauley also had an ongoing business relationship buying, selling, and trading human remains, purchased several of the specimens that originated in Arkansas, knowing that Pauley had obtained them from the defendant, who stole them. Pauley shipped the remains, including the stillborn corpse of Lux, from Pennsylvania to Lampi in Minnesota, along with $1,550, in exchange for five human skulls from Lampi. Lampi also purchased human hearts, brains, an arm, and a pair of "smoker's lungs," all stolen. After an authorized search of Lampi's residence failed to recover the stillborn remains, Lampi, through an attorney, voluntarily turned Lux's body over to the FBI in April 2023. *See Government's Sentencing Memorandum,* ECF No. 43. Unlike the defendant, Lampi did not himself steal human remains, and is therefore less culpable than the defendant. *Id.*

Here, the defendant initiated the entire scheme with Pauley on October 28, 2021, when she contacted Pauley through Facebook and introduced herself as a mortician at a trade service

7

mortuary, explaining the mortuary was contracted through UAMS in Little Rock to cremate medical cadavers. The defendant sent Pauley a Facebook message stating, "I follow your page and work and LOVE it… Just out of curiosity, would you know anyone in the market for a fully in tact [sic], embalmed brain?" PSR ¶ 8. Pauley was a member of a Facebook group concerning "oddities." *Id*. The defendant was also a member of this Facebook group, and she knew that Pauley bought and sold human remains. *Id*.

Importantly, it was the defendant who made contact with Pauley – he did not solicit her. It was her offer that began this gruesome business arrangement. Likewise, it was the defendant – not Pauley - who first posed the question of whether Pauley would like to purchase the remains of human infants. PSR ¶ 10. On or about December 15, 2021, the defendant asked Pauley through Facebook Messenger if he would be interested in purchasing a fetus. *Id*. The defendant explained to Pauley, "we get stillbirths all the time UAMS, and basically give the parents back a pinch of ashes from a whole person we cremated—do you collect fetuses?" *Id*. Pauley affirmed his interest and sent a photo to the defendant of a glass display in his home. On those shelves sat 12 jars containing preserved infant corpses. *Government's Exhibit A*, p. 5651. The defendant sent photographs of two "examples" of stillborn infant corpses, purportedly ones she received at work, and she and Pauley discussed methods of preserving them. *Id*. at pp. 5653, 5655 – 5656. The defendant then declared this arrangement "[o]ur forever secret." *Id*. at 5656.

To be clear, it was the defendant's own greed that led her down this path. She remarked to Pauley, on November 11, 2021, "I always need a side hustle for my tattoo addiction and I like when things don't go to waste." *Government's Exhibit A* at p. 5560. And on January 24, 2022, she stated, "[w]e are trying to buy a house at the end of the year so we are really hustling to make that

8

happen. *Id.* at 5680. In sum, the defendant received a total of $10,625 from Pauley, which she will now pay to the United States in the form of a fine. PSR ¶

In her sentencing memorandum, the defendant points to trauma that led to a numbness or desensitization culminating in the instant charges. However, that does not explain the numerous instances when she expressed to Pauley that she knew what she was doing was wrong. If stealing and selling stillborn fetal remains were lawful or moral, why would the defendant need it to be a "forever secret?" It is neither lawful nor moral, and the defendant knew it. From the very beginning of her scheme with Pauley, she knew that stealing and selling other body part was similarly illegal, . For instance, on or about November 16, 2021, she wrote "[s]o…should I be concerned about the cops knocking on my door for this brain/skull combo that's missing in the oblivion of the post office? 😂." *Government's Exhibit A,* p. 5578. On November 24, 2021, she told Pauley "He had his femurs, hips, ribs, and scapulas but I didn't want to get greedy and my boss find out 😂😂😂." *Id.* at p. 5589. That same day, in reference to a skull she had that purportedly belonged to an unidentified murder victim, she told Pauley "I want to sell it on the oddities marketplace, but I don't want to use my damn name and Facebook because I don't trust people 😂." *Id.* On or about December 8, 2021, she wrote, "You're my only under the table buyer so you got it[.]" *Id.* at 5631. On December 10, 2021, she stated, "I'm gonna mail them in increments because I'm paranoid 😂😂😂[;] [d]o they like scan boxes like the TSA at airports does luggage? 😂[.] *Id.* at 5641. On December 24, 2021, the defendant stated, "I'm gonna be floored if the cops don't come knocking on my door soon 🙄😂." *Id.* at 5663. After selling Pauley the bodies of two stillborn infants, on February 18, 2022, the defendant messaged him about another: "I have another baby.

y
z
w

We are waiting on paperwork to cremate it, but I'm trying to snatch it for you…" *Id.* at 5694. On June 30, 2022, she stated, "Got some bodies today. Looting them as soon as I can sneak over to them." *Government's Exhibit B* at p. 5452.

Despite all the protestations of "paranoia" about the "cops," the defendant – in her own words - continued to snatch, sneak, and loot human remains. And she continued to offer them for sale to Pauley like they were normal goods in a normal marketplace. She sent him photo after photo, displaying from her home and work pieces of skin, skulls, and organs, and, worst of all, photos of the stillborn babies she had for sale. *See Government's Exhibits A and B.* She did not just do it once or even twice. In total, she sent 24 boxes containing stolen human remains to Pauley between October 31, 2021, and July 15, 2022. PSR ¶ 14. At any point, she could have put an end to this arrangement. Instead, the only reason she was stopped was because she was caught when the FBI executed a search warrant at her home. PSR ¶ 13.

After the execution of the search warrant at the defendant's home, the defendant was indicted and an expanded, nationwide investigation ensued, resulting in the indictments of Pauley and Lampi in the Middle District of Pennsylvania. https://www.justice.gov/usao-mdpa/pr/minnesota-man-sentenced-15-months-trafficking-stolen-human-remains. Additional sources of stolen human remains have been identified and indicted as well. *Id.* Additionally, according to the defendant's sentencing memorandum, "[t]he world's largest oddities expo, "The Oddities and Curiosities Expo", is scheduled to have 37 exposition events in 29 different States in 2025 and the Oddities and Curiosities Expo Facebook page as of this writing has approximately 243,000 likes and approximately 453,000 followers. ECF No. 59, p. 5. Given the existence of a nationwide network of trade in stolen human remains and substantial public interest in "oddities"

10

events and displays, the need for general deterrence against obtaining, buying, and selling stolen human remains cannot be overstated.

The defendant was an apprentice mortician, working at a licensed mortuary, who in turn worked with other funeral homes and hospitals. As such, she had access to bodies and body parts. The Government understands that the defendant has already received a 2-level enhancement for abuse of position of trust, but factors that have already been taken into account in calculating the advisory Guidelines range can nevertheless form the basis of a variance. *Stoner*, 795 F.3d at 885. The defendant was entrusted with the task of cremating the body parts and stillborn infants according to the wishes of the decedents or their next of kin, and she consciously and flagrantly abused that trust. Decedents and their next of kin are entitled to be handled with care and dignity by morticians, embalmers, and funeral directors. Imposing a substantial sentence above the guideline range would send a message to those involved in the "oddities" and the death industry that engaging in the trade of stolen human remains is unacceptable and will be punished severely.

The consequences of the defendant's actions as to the victims are impossible to quantify. When medical cadavers reach the end of their intended usefulness in medical labs, the various unattached organs and limbs are kept together with the body through final disposition. The defendant here took it upon herself to separate those detached remains from their bodies, leaving it impossible to specifically identify the remains. The effect is that the next of kin and relatives of the decedents will never know whether it was their loved one whose body parts were stolen, trafficked, and put on display. For those victims that could be identified, the defendant acted with callous disregard of their grief. She knew they were mothers of two stillborn infants, and she knew that at least one of the mothers was expecting to receive her son's ashes after he was cremated.

11

Because of the defendant's greed and appalling conduct, both mothers had to endure learning the horrific news that their babies, who they thought had been laid to rest, had been stolen and trafficked. Lux's mother had to suffer learning that the cremated remains she received, which were made into a memorial pendant and kept in an urn, were not those of her son. The defendant intentionally robbed the two mothers of any closure they might have had and has forced both mothers to relive their pain and grief.

The despicable facts in this case are simply not accounted for by the Guidelines and warrant additional consideration for purposes of sentencing. The law permits an upward variance and the facts support it. An upward variance to 180 months' imprisonment is justified in this case due to the shocking and outrageous nature of the offense, the callous disregard of the victims by the defendant, the need to reflect the seriousness of the offense, and the need to afford adequate deterrence to this particular type of criminal conduct. As demonstrated in *Government's Exhibits A* and *B*, the defendant's conduct warrants imposition of 180 months' imprisonment.

WHEREFORE, for all the above reasons, the United States requests that the Court grant this Motion for Upward Variance and sentence the defendant to 180 months' imprisonment in addition to the agreed-upon fine, restitution to the victims, a term of supervised release, and a $100 special assessment).

(END OF TEXT. SIGNATURE PAGE ATTACHED).

Respectfully Submitted,

JONATHAN D. ROSS
United States Attorney

_____
AMANDA JEGLEY
Assistant United States Attorney
Arkansas Bar Number 2010045
P. O. Box 1229
Little Rock, Arkansas  72203
501-340-2600
Amanda.jegley@usdoj.gov